# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TRACY DEMPS,**

               **Plaintiff,**

**-vs-**                                                                 **Case No.  6:05-cv-945-Orl-JGG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION,**

               **Defendant.**

_____

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Tracy Demps ["Demps"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED**.

## I.   <u>PROCEDURAL HISTORY</u>

On July 17, 2002, Demps filed a claim for disability insurance benefits, claiming disability as of February 1, 2002 due to multiple sclerosis.  R. 68.  The Commissioner denied her claim initially and upon reconsideration. R. 35, 40. On December 15, 2004, the Honorable John Marshall Meisburg, Administrative Law Judge ["ALJ"], held a thirty-minute hearing on Demps' claim in Daytona Beach, Florida.  R. 262 - 87.  At the hearing, Demps specified that she sought benefits for a closed period of disability from February 1, 2002 to April 12, 2004.  R. 264.  Non-attorney Mario Cobrella represented Demps at the hearing.  R. 262.  The ALJ heard testimony from Demps.  R. 263.

On March 24, 2005, the ALJ issued a decision that Demps was not disabled and not entitled to benefits.  R. 20 - 30.  Following a review of the medical and other record evidence, the ALJ found that Demps could not perform her past relevant work as a process inspector, machine operator, certified nursing assistant, packager, and grinder.  R. 21, 28, Finding 7.  The ALJ found that Demps nevertheless retained the residual functional capacity ["RFC"] to perform the physical exertional requirements for "substantially all of the full range" of sedentary work.  R. 28, Finding 11.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Demps was not disabled.[1]  R. 30, Findings 12-14.

On June 3, 2005, the Appeals Council denied review.  R. 5.  On June 24, 2005, Demps timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1, ¶2.  On January 18, 2006, Demps filed in this Court a memorandum of law in support of her appeal.  Docket No. 11.  On March 20, 2006, the Commissioner filed a memorandum in support of her decision that Demps was not disabled.  Docket No. 13.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Demps assigns two errors to the Commissioner.  First, Demps claims that the Commissioner failed to meet her burden to establish that Demps could perform other work that exists in the national economy.  Docket No. 11 at 1, 5.  Demps argues that the ALJ should have heard testimony from an impartial vocational expert in light of Demps' significant non-exertional impairments.  *Id.* at 5 - 7.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.  According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

Second, Demps contends that the Commissioner improperly discredited Demps' subjective complaints, and that substantial evidence supports Demps' complaints of headaches, fatigue, numbness, and other symptoms related to multiple sclerosis.  Docket No. 11 at 1, 7-9.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ correctly determined that Demps's non-exertional impairments did not significantly limit her ability to perform substantially the full range of sedentary work.  Docket No. 13-1 at 5, 12.  According to the Commissioner, exclusive reliance on the grids was proper, and the Commissioner met her burden  to establish that Demps could perform other work that exists in the national economy.  *Id.*  Second, the Commissioner argues that the ALJ properly articulated specific reasons that are supported by the objective medical evidence for discounting Demps' subjective complaints.  *Id.* at 15 - 19.

## III.    **THE STANDARD OF REVIEW**

### A.    **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.      REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate

-4-

award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

---

Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits.  *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### B.     THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and

well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v.*

*Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a

vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also, 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a

physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.     PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.     THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social

-16-

functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of

-18-

impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   **APPLICATION AND ANALYSIS**

### A.   **THE FACTS**

Demps was born on October 27, 1966, and was thirty-eight years old on the date of the ALJ's decision.  R. 21, 30, 68, 266.  Demps completed high school, and has work experience as a process inspector, machine operator, certified nursing assistant, packager, and grinder.  R. 96 - 102, 104 - 05, 266.  Demps alleges disability due to multiple sclerosis ["MS"] for a closed period from February 1, 2002 to April 12, 2004, the date she returned to work running an in-home day care center.  R. 68, 264.

Demps submitted notes from her visits covering the period from July 28, 1999 to March 31, 2003, but the ALJ never ascertained the name of the treating physician who wrote the notes.[3]  *See* R. 209 - 22.  On July 28, 1999, Demps first sought medical treatment from this unnamed doctor for numbness throughout her body and for feeling "off balance."  R. 222.  Demps reported experiencing similar symptoms, as well as slurred speech for one month in 1995.  *Id.*  Demps also complained of headaches and tightness in her chest on the left side.  *Id.*  The unknown doctor ordered laboratory tests, and diagnosed peripheral paresthesia, lightheadedness, neck pain, vertigo, displopia (double vision), and visual deficit.  *Id.*  Demps returned with similar complaints on August 10, 1999.  R. 221.  The

---

[3]On November 5, 2001, Demps saw Dr. Elias M. Gizaw for a consultation upon referral from Mark Webster, D.O. R. 176.  Other than Dr. Gizaw's letter thanking Dr. Webster for the referral, the record does not clearly corroborate that the unnamed physician is, in fact, Dr. Webster.

physician diagnosed bordeline anemia, fatigue, peripheral parasthesia, displopia, visual deficit, and headaches, and prescribed medication for Demps' headaches. *Id.*

Several months later, on February 5, 2001, Demps returned to the physician with complaints of stress and anxiety. R. 219. She also reported feeling pain and a burning sensation on her left side extending to the left arm pit and down the left arm. *Id.* The physician ordered an electrocardiogram (EKG). *Id.* On February 8, 2001, Demps reported having headaches and anxiety. R. 220. The physician noted that Demps' EKG results were abnormal, and ordered more tests. *Id.* The physician also noted that Demps could return to work. *Id.*

Between March and September 2001, Demps returned to the unknown physician for several follow-up appointments. R. 216 - 18. During these visits, Demps continued to complain of chest pain and discomfort, headaches, and anxiety. *Id.* On March 5, 2001, the physician noted that Demps was "okay" to return to work. R. 218. On July 30, 2001, the physician told Demps to schedule a "psych" appointment. R. 217. On August 8, 2001, the physician wrote a note for Demps to return to work. *Id.* On August 14, 2001, the physician referred Demps for an MRI. *Id.* MRI results of the brain (dated August 22, 2001) showed evidence of acute changes in the periventricular area in the deep white matter. R. 154. On September 10, 2001, Demps returned to the unknown physician with continued complaint of "anxiety syndrome." R. 216.

On November 5, 2001, Demps saw Dr. Elias Gizaw, M.D., at Florida Neurology, P.A. for an evaluation of her frequent headaches. R. 176 - 78. Demps stated that she experienced "pounding" headaches three to four times a month on the left side of her head, and complained that the headaches occasionally radiated to her neck and caused stiffness. R. 176. Demps also reported some weakness

in her lower extremities, as well as numbness and intermittent tingling in her hands.  *Id.*  Dr. Gizaw noted that Demps' physical examination was abnormal for left-sided hyperreflexia (which he also noted was consistent with her previous abnormal MRI results).  R. 177.  The doctor diagnosed demyelinating diseases and vasculitis, and ordered additional laboratory tests.  *Id.*

Demps returned to Dr. Gizaw for follow-up appointment on November 15, 2001.  R. 175.  She continued to complain of headaches, numbness and tingling in the hands, and weakness in the lower extremities.  *Id.*  Demps also reported having problems with balance and coordination.  *Id.*  Dr. Gizaw stated that her history, physical findings, and MRI studies were "quite suspicious for multiple sclerosis." *Id.*  He ordered another MRI of the brain and the cervical spine.  *Id.*

On December 4, 2001, Dr. Gizaw saw Demps.  R. 174.  He informed her that the results of her laboratory tests and MRI of the brain and her cervical spine were "clearly consistent" with demyelinating disease, and further noted that the MRI results showed evidence of demyelinating disease in the cervical cord and the brainstem, as well as supratentorial white matter.  *Id.*  Dr. Gizaw's physical examination revealed mild weakness in Demps' left lower extremity.  *Id.*  The doctor recommended treatment with Avonex or Betaseron (medications to treat MS).  *Id.*

Demps claims disability as of February 1, 2002, the day she stopped working due to MS.  R. 68, 266.  On February 5, 2002, Demps returned to Dr. Gizaw who again observed that Demps' MRI results showed evidence of demyelinating disease.  R. 168 - 69.  Demps stated that she continued to experience numbness and tingling, as well as intermittent weakness.  R. 168.  She also stated that when she previously returned to work, she had periods when her right leg felt weak and almost "gave out under her." *Id.*  Demps also complained of generalized fatigue and lack of stamina.  *Id.*  On March

1, 2002, at a follow-up visit with Dr. Gizaw, Demps reported that the numbness and tingling on her right side had diminished. R. 167. She continued to complain of experiencing generalized fatigue, intermittent numbness and tingling, and weakness in her lower extremities. *Id.* Dr. Gizaw prescribed Avonex. *Id.*

On May 22, 2002, Dr. Gizaw saw Demps, and noted that she was "tolerating the Avonex rather well." R. 166. Demps reported being eager to return to work, and Dr. Gizaw gave Demps a "release back to work, but only on light duty." *Id.* Dr. Gizaw did not specify what he meant by "light duty." He continued to prescribe Avonex. *Id.*

On June 6, 2002, Demps went to the unknown treating physician with complaints of fatigue, poor appetite, inability to sleep, and constipation. R. 215. The doctor noted that Demps was seeking treatment with Dr. Gizaw, and diagnosed MS and paresthesias of the hands. *Id.*

On July 3, 2002, Demps visited Dr. Gizaw, and reported having significant pain and flu-like illness. R. 164. Demps specified that she had not experienced any recurrent MS-related attacks, but still had generalized weakness and excessive fatigue. *Id.* Her physical examination revealed mostly normal results, except her finger-to-nose test showed mild dysmetria. *Id.* Demps also exhibited decreased rapid alternating movements bilaterally. *Id.* Dr. Gizaw discussed the possibility of switching from Avonex to Betaseron medication, but noted that Demps was reluctant to consider the option. *Id.* On July 17, 2002, Demps filed her claim for disability insurance benefits. R. 68.

On October 21, 2002, Cary Cater, D.O., a non-examining state agency physician, completed a physical RFC assessment. R. 155 - 62. Dr. Cater opined that Demps retained the RFC to perform light work. R. 156. Demps was able to lift and carry twenty pounds occasionally and ten pounds

frequently; stand, walk, and/or sit approximately six hours in an eight-hour workday; and push and pull without limitation.  *Id.*  According to Dr. Cater, Demps had no postural, manipulative, visual, communicative, or environmental limitations.  R. 157 - 59.

Demps returned to Dr. Gizaw on November 19, 2002.  R. 163.  Again, she complained of fatigue.  *Id.*  Demps' strength in her upper extremities was 4+ in the deltoids and 5/5 in her biceps and triceps.  *Id.*  In her lower extremities, Demps' strength was 5- in the iliosoas, and 5/5 in her quadriceps and hamstrings.  She was also hyperreflexic in her lower extremities.  *Id.*

On November 25, 2002, at the request of the office of Disability Determinations, Dr. Rosimeri Clements, Psy.D., (and her clinical intern Brian Fisak, M.S.) completed a General Clinical Evaluation with Mental Status.  R. 179 - 82.  Demps reported experiencing fatigue and persistent numbness which limited her ability to write and overall, interfered with the fine motor coordination in her hands.  R. 179.  Further, Demps reported limitations in her daily activities such as cleaning the house, driving long distances, and prolonged standing.  *Id.*  Demps also complained of depression, which began after her mother's death in 1995 and was exacerbated by her brother's death in 2000.  *Id.*  She described her periods of depression as feeling isolation, limited tolerance, lack of motivation, and anhedonia. R. 180.  Demps also complained of having flu-like symptoms as a side effect of taking Avonex, and stated that her depressive symptoms disrupted her sleep.  R. 181.  Dr. Clements examined Demps, and observed that Demps was logical and coherent.  R. 180.  Demps drove herself to the examination, and exhibited no signs of acute mental distress.  *Id.*

Dr. Clements stated that Demps' prognosis is "fair," and recommended that Demps be evaluated for psychiatric medications and see a psychologist for cognitive therapy.  R. 181.  Dr.

Clements noted that Demps was experiencing symptoms related to MS "that have been limiting her functioning, including the loss of her job," and stated that Demps had been experiencing recent "mild depressive symptoms." *Id.* Dr. Clements diagnosed [DSM-IV 296.31] Major Depressive Disorder, Recurrent, Mild [4] on Axis I, and a present Global Assessment of Functioning ("GAF") score of 55 on Axis V.[5] R. 182.

On December 14, 2002, Dr. Deborah I. Carter, a non-examining state agency psychiatrist, completed an assessment of Demps' mental limitations. R. 183 - 95. Dr. Carter opined that Demps' depression and mental impairments were not severe. Docket No. 183. The psychiatrist also opined as to the degree of Demps' functional limitations due to depression. Docket No. 193. According to Dr. Carter, Demps had "mild" limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace. *Id.* Further, Demps experienced no episodes of decompensation of extended duration. *Id.*

---

[4]The diagnosis and code are from the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"]. The diagnostic criteria for DSM-IV 296.3 Major Depressive Disorder are the presence of two or more major depressive episodes including: depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day; feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideations. The DSM-IV at 345 and 327 establishes the diagnostic criteria for Major Depressive Disorder, Recurrent. The diagnosis code is 296.3x. The last digit in the diagnosis code is reserved as a severity specifier for the most recent Major Depressive Episode that forms part of the disorder, and .x1 indicates "mild." A "mild" Major Depressive Episode is one that has "few, if any symptoms in excess of those required to make the diagnosis and symptoms result in only minor impairment in occupational functioning or in usual social activities or relationships with others." DSM-IV at 377.

[5]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF code of 51 - 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

On February 8, 2003, Demps went to the Florida Hospital emergency room because of a motor vehicle accident. R. 198. Demps complained of experiencing headaches and cervical spine pain, as well as discomfort in the left side of her chest from the car seatbelt. R. 199. The treating physician diagnosed cervicalgia (neck and shoulder pain), and prescribed Skelaxin (a muscle relaxant) and Motrin for her pain. R. 299. Demps was discharged the same day. R. 203.

Demps also sought treatment with the unnamed physician for neck and chest pain related to the motor vehicle accident. R. 209 - 14. On February 13, 2003, Demps complained of neck pain, stiffness, and decreased range of motion since the accident. R. 212. She stated that the Skelaxin (prescribed by the emergency room doctor) helped her pain, but that she still had difficulty sleeping. *Id.* The doctor noted limited range of motion upon physical examination, and assessed cervical strain and sprain from the motor vehicle accident and ligamentous instability of her cervical spine. *Id.* The doctor recommended applying heat and massage therapy to the cervical spine for two to three weeks, and prescribed Flexeril and Ultracet for her pain. *Id.*

On February 14, 2003, the doctor observed that Demps' right upper trapezius was contracted, and that her left trapezius was tender. R. 213. Demps also complained of headaches. *Id.* On February 20, 2003, Demps stated that her neck felt better from the therapy, but complained of fatigue. R. 213. Results from an MRI of Demps' cervical spine, dated February 26, 2003, was "unremarkable," and showed only mild scoliotic curvature. R. 205.

Demps saw the unnamed physician several times in March 2003 for follow-up visits. R. 209 - 11. The visit notes indicate that Demps' right upper trapezius and rhomboid were contracted, but showed some improvement. R. 209 - 10. Demps also continued to complain of headaches that

fluctuated in frequency.  R. 210.  An MRI of the brain dated March 13, 2003 was consistent with the clinical history of multiple sclerosis, with multifocal areas of abnormal signal in the periventricular white matter and corpus callosum, stable since November 29, 2001.  R. 250 - 51.  On March 21, 2003, the unknown physician noted that Demps' right upper dorsal area, cervical range of motion, and headaches had improved.  R. 210.  However, on March 25, 2003, Demps complained that her headaches were more frequent and intense, and requested a different pain medication.  *Id.*

Demps claims disability for a closed period ending April 12, 2004, the date Demps returned to work running a day care center in her home.  R. 264.  On April 24, 2003, Dr. Michael R. Stevens, a non-examining state agency psychologist, completed a psychiatric review of Demps.  R. 223 - 35. Dr. Stevens also opined that the mental impairments due to Demps' "mild" depression were not severe.  R. 223, 226.  The psychologist further opined that Demps' mental impairments posed no limitations on her activities of daily living and ability to maintain concentration, persistence, or pace; and mild limitations on her ability to maintain social functioning.  R. 233.  Further, Demps had no episodes of decompensation.  *Id.*

On May 3, 2003, at the request of the Office of Disability Determinations, Dr. Geeta Narula, M.D. examined Demps for a physical evaluation.  R. 237 - 38.  Demps relayed her history, including the diagnosis of MS and her treatment history.  R. 237.  Demps reported taking Avonex for the MS for over a year, and stated that since she started taking Avonex, she has been "stable."  *Id.*  Demps, however, had complained of having headaches; numbness in the hands, fingertips, and legs; weakness in both legs, being easily fatigued; and having a low tolerance for any activity.  *Id.*  Demps also stated that she feels frustrated easily and has become forgetful.  *Id.*  Dr. Narula's physical examination

revealed mostly normal results, but the doctor noted that "[r]epetitive activity was tested [and] [t]his demonstrates fatigue.  *Id.*  Dr. Narula observed, however, that Demps was able to do fifteen leg lifts and fifteen waist bends before she became fatigued.  *Id.*  Dr. Narula concluded that Demps could not perform her past work which involved standing for eight hours in a day, but opined that Demps could work in "a sedentary-type activity, primarily using her hands and where she would be able to change positions at will."  *Id.*

On June 18, 2003, another non-examining state agency physician, Dr. Murthy Ravipati, M.D., assessed Demps' physical RFC as of June 2003.  R. 239 - 46.  Dr. Ravipati opined that Demps could lift and carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours in an eight-hour workday, sit for approximately six hours in an eight-hour workday, and push and pull without limitation.  R. 240.  He also stated that because of fatigue related to MS, Demps had occasional postural limitations (including her abilities to climb, balance, stoop, kneel, crouch, and crawl) and manipulative limitations (including her abilities to reach in all directions, handle, finger, and feel).  R. 241 - 42.  Further, Demps had no visual or communicative limitations, but because of her fatigue, Demps had to avoid concentrated exposure to extreme cold or heat and avoid moderate exposure to heights.  R. 242 - 43.

On July 5, 2004, Dr. Gizaw completed a Physical Capacities Evaluation for Demps.  R. 253 - 56, 258 - 59.[6]  Dr. Gizaw opined that Demps could lift and carry up to five pounds frequently and

---

[6]The record contains two Physical Capacities Evaluation forms by Dr. Gizaw that are both dated July 5, 2004. R. 253 - 56, 258 - 59.  Dr. Gizaw first filled out a four-page Physical Capacities Evaluation, but failed to complete certain sections of the form's first two pages.  R. 253 - 56; *see also* R. 286 - 87.  Dr. Gizaw completed the missing sections, and resubmitted the first two pages of the Physical Capacities Evaluation form.  R. 259 - 60; *see also* R. 286 - 87.

between eleven and twenty pounds occasionally[7]; sit for six or more hours and stand or walk for three hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, crawl, and reach above shoulder level.  R. 258 - 59.  Dr. Gizaw also stated that throughout an eight-hour workday, Demps needed an opportunity to alternate between sitting and standing at will.  R. 258.  In addition, Demps could have no exposure to unprotected heights and marked changes in temperature and humidity, and had severe restrictions from activities involving moving machinery or exposure to dust, fumes, and gases.  R. 259.

Dr. Gizaw further opined that Demps could use her hands adequately for simple grasping, pushing and pulling, and fine manipulation.  R. 258.  However, Demps could not use her hands for repetitive motions (such as writing, typing, and assembly), and could not use her feet for repetitive movements (such as operating foot controls).  *Id.*  Dr. Gizaw stated that Demps suffered from fatigue due to MS, and concluded that her fatigue would prevent her from "working full-time at even a sedentary position."  R. 255.  The Evaluation does not define "sedentary."  R. 253 - 56, 258 - 59.  Dr. Gizaw further noted that Demps had significant disorganization of motor function in her two extremities, and sustained disturbance of gross and dexterous movement in the extremities.  R. 256.  He further stated that Demps had substantial muscle weakness on repetitive activity.  *Id.*  Dr. Gizaw does not state whether his opinions cover the date of his evaluation, or only the closed period of disability alleged by Demps.  Dr. Gizaw's second evaluation form contains handwritten notes from an unknown source that state the date of the ALJ hearing and the dates of Demps' closed period of disability.  R. 258.

---

[7]According to the Physical Capacities Evaluation form, "occasionally" is defined as 33 percent of an eight-hour workday, and "frequently" is defined as 33 to 100 percent of an eight-hour workday.  R. 259.

On July 7, 2003, Demps went to Dr. Gizaw for a follow-up visit. R. 249. Demps reported that overall, her MS symptoms were "well controlled[,]" and denied having any "major attack[s]." *Id.* Demps also complained of having a weak bladder, and experiencing frequent headaches and fatigue, although Dr. Gizaw noted that Demps refused to take medication for her fatigue. *Id.* Dr. Gizaw recommended that Demps return for a follow-up appointment and continue taking Avonex. *Id.*

Demps returned to Dr. Grizaw on February 10, 2004, and continued to complain of fatigue and intermittent headaches. R. 247. However, Demps also reported that her MS symptoms were well-controlled. *Id.* Dr. Gizaw assessed relapsing-remitting MS, and recommended that Demps continue taking Avonex. R. 248. On October 12, 2004, Demps visited Dr. Gizaw. R. 257. Demps reported experiencing significant fatigue and having intermittent episodes of numbness and tingling in her extremities, but also stated that she was running her own daycare center and had been functioning well. *Id.* Dr. Gizaw, again, noted that Demps' MS was well-controlled by Avonex. *Id.*

On December 15, 2004, Demps testified at the hearing before the ALJ. R. 264 - 86. Demps testified that she began taking Avonex by injection in 2002 for MS. R. 274 - 75. She stated that Avonex caused headaches as a side effect. R. 275. She also stated that the headaches sometimes lasted over two hours, and that the intensity of her headaches made her cry. R. 275 - 76. She further testified that she had headaches approximately three times a week during her period of disability from 2002 to 2004. R. 276. Demps stated that she experienced headaches after her period of disability, but they were less intense. R. 277. Demps also testified that she continues to experience tingling in her hands and swelling in her fingers. *Id.* According to Demps, during her period of disability, she experienced fatigue every day, and the fatigue lasted all day. R. 278. Demps testified that her fatigue

also affected her emotionally, and that she felt less tolerance for social interaction. R. 279. Demps also testified that she felt weak in her upper arms, and that her weakness continued past her period of disability, even as of the day of the hearing. R. 280. Demps stated that between 2002 and 2004, she could lift, at most, ten or fifteen pounds. *Id.*

Demps also testified that after Dr. Gizaw released her back to work on "light duty," she went back to work for two days, but stopped working because she experienced fatigue, weakness, and could not stand for a prolonged period of time. R. 281. The ALJ asked Demps whether Demps could have performed an unskilled job that involved sitting the entire day during her period of disability, and Demps responded, "Yes, I could have." R. 282. In her testimony, Demps subsequently confirmed that she felt she could have performed an unskilled job that involved sitting on a consistent basis for eight hours a day and five days a week. R. 283. However, Demps later stated that she might not be able to "manage" a job because if she experienced a headache while working, she would have to leave work. R. 283 - 84. Demps testified that she lives alone, so during her alleged period of disability, she cooked and cleaned for herself but did not do any extensive cleaning. R. 284 - 86. She was able to drive, and go to the store. R. 285. She went to church every week, but did no other activity outside of her home. R. 286.

### B.     THE ANALYSIS

#### 1.     Exclusive Reliance on the Grids

First, Demps claims that the Commissioner failed to meet her burden to establish that Demps could perform other work that exists in the national economy, and argues that the ALJ erred by exclusively relying on the grids. Docket No. 11 at 1, 5. According to Demps, the ALJ should have

-30-

heard testimony from a VE in light of Demps' significant non-exertional impairments, including her headaches, fatigue, and need for a sit or stand option (as articulated by Dr. Gizaw and Dr. Narula). *Id.* at 6 - 7.  The Commissioner responds by arguing that the ALJ correctly determined that Demps' non-exertional impairments did not significantly limit her ability to perform substantially the full range of sedentary work.  Docket No. 13-1 at 5, 12.  The Commissioner argues that exclusive reliance on the grids was proper, and that the Commissioner met her burden  to establish that Demps could perform other work that exists in the national economy.  *Id.*

Exclusive reliance on the grids is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level, or when a claimant has a non-exertional impairment that significantly limits basic work skills.  The ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  Headaches and fatigue are non-exertional impairments.[8]  Further, the ALJ should generally consult a VE when a claimant must alternate periods of sitting and standing.[9]

---

[8]A non-exertional impairment is any impairment that does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull.  Social Security Ruling 83-10.  Non-exertional impairments thus include postural, manipulative, visual, communicative, or environmental limitations.  *Id.*; *see also* 20 C.F.R. § 416.945(d).

[9]Social Security Rule 83-12 provides, in relevant part, that:

In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing . . . .  Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . .

Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base.

SSR 83-12 (emphasis added).

In this case, the ALJ stated a finding that Demps' capacity for sedentary work was not compromised by any nonexertional limitations. R. 30, Finding 13. However, the ALJ failed to specify or explain why he found that Demps headaches or fatigue did not significantly limit her ability to perform substantially the full range of sedentary work, or why the ALJ disregarded two physicians' opinions that Demps required a sit or stand option for work.

After a review of the medical and other record evidence, the ALJ stated that he accorded "significant weight" to Dr. Gizaw's opinions (as expressed in his Physical Capacities Evaluation) and the opinions of the non-examining state agency "consultant"[10] in concluding that Demps could perform sedentary work and did have any significant mental limitations. R. 26. The ALJ, however, did not state why he disregarded Dr. Gizaw's opinions that: 1.) in an eight-hour workday, Demps needed an opportunity to alternate between sitting and standing at will (R. 258); 2.) Demps could not use her hands for repetitive motions (such as writing, typing, and assembly), and could not use her feet for repetitive movements (such as operating foot controls) (*id.*); and 3.) Demps's fatigue would prevent her from "working full-time at even a sedentary position." (R. 255). The ALJ claimed that he relied on the treating physician's opinions, but did not state good cause for apparently rejecting some of those opinions. Further, Dr. Narula opined that Demps could perform sedentary work but that she required the option to sit and stand at will. R. 237. The ALJ did not explain why he rejected these doctors' opinions as to Demps' non-exertional impairments.[11]

---

[10]The ALJ refers to a single "state agency consultant" but two state agency physicians, a state agency psychiatrist, and a state agency psychologist all opined as to Demps' limitations. R. 26.

[11]In fact, the ALJ noted that "Dr. Narula opined that she would be able to work in a sedentary-type activity, primarily using her hands and where she would be able to change positions at will." R. 26. The ALJ never specified the weight he assigned to Dr. Narula's opinions. *See id.* The ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and ordinarily, the failure to do so is reversible error. However, in her

In addition, Demps testified that during her alleged closed period of disability, she suffered from headaches, fatigue, and numbness.  After reviewing Demps' testimony, the ALJ found that Demps's "allegations regarding her symptoms and limitations [were] not credible "to the extent she claims she is precluded from all work activity."  R. 25.  The ALJ never explicitly rejected Demps' claims that she *had* headaches or fatigue, and never explains why these non-exertional impairments placed no limits on Demps' ability to perform all or substantially all of the full range of sedentary work.  Demps is correct that exclusive reliance on the grids was improper, and that the Commissioner failed to meet her burden to establish other jobs in the national economy that Demps could perform.

### 2.   Demps' Subjective Complaints

Next, Demps contends that the Commissioner improperly discredited Demps' subjective complaints, and that substantial evidence supports Demps' complaints of headaches, fatigue, numbness, and other symptoms related to MS.  Docket No. 11 at 1, 7-9.  The Commissioner argues that the ALJ properly articulated specific reasons that are supported by the objective medical evidence for discounting Demps' subjective complaints.  Docket No. 13-1 at 15 - 19.

The ALJ found that Demps' subjective complaints were not credible because: 1.) her symptoms were well-controlled on medication; 2.) Dr. Gizaw released Demps to "light duty" work in 2002; 3.) Demps refused a prescription for medication that would alleviate her fatigue; 4.) Demps' job running an in-home daycare center is inconsistent with her allegations of fatigue and inability to work; and 5.) Demps' activities of volunteering at church, doing housework, driving, and socializing were inconsistent with Demps' allegations of disability.  R. 26.  While a reviewing court should not

---

memorandum before the Court, while Demps argues that the ALJ improperly rejected Dr. Gizaw's and Dr. Narula's opinions, Demps does not seek reversal and remand on this issue.  *See* Docket No. 11 at 6 - 9.

disturb a clearly articulated credibility finding, in this case, the ALJ's articulated reasons are inadequate and unsupported by substantial evidence.

First, Dr. Grizaw did report that Demps' MS symptoms were well-controlled (*see* R. 247, 249, 258), but Dr. Grizaw also opined that fatigue limited Demps' ability to work.  R. 258 - 59.  As discussed earlier, the ALJ stated no reason for rejecting the treating physician's opinion that fatigue limited Demps' ability to work.  Second, Dr. Gizaw never defined what he meant by "light duty" work.  *See* R. 167.  Demps testified that she stopped working after two days due weakness and fatigue. R. 281.  Third, Dr. Gizaw noted that Demps refused to take medication for her fatigue (R. 249), but the ALJ failed to address how this fact affects Demps' other subjective complaints.  Fourth, Demps seeks a closed period of disability which ends when Demps began running her in-home daycare center. The ALJ did not state why Demps's work after the closed period had ended means that she experienced no significant symptoms during the closed period.  Finally, other than stating that Demps's activities of daily living were inconsistent with a "complete inability to work," the ALJ did not explain why Demps could not do these activities with headaches, fatigue, and numbness.  R. 26. The ALJ provided insufficient explanations for discrediting Demps' subjective complaints and remand is required.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **REMANDED** under

sentence four for further proceedings not inconsistent with this decision.  The Clerk should enter a

judgment and close the case.  The 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) for seeking

attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) is hereby extended until 30 days

after the Commissioner's final determination of Plaintiff's past-due benefits, if any.  *See Bergen v.*

*Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

      **DONE AND ORDERED** this 17th day of September, 2006.

 

                                        JAMES G. GLAZEBROOK
                                UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia     30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL      33602

The Honorable John Marshall Meisburg
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL      32817